Denny **ALMONTE, P.P.A., Richardo Almonte and Gladys Almonte,** et al.

v.

**NEW YORK MEDICAL COLLEGE and Dr. Douglas Ingram.**

Civ. No. 3:93CV00116 (AHN).

United States District Court, D. Connecticut.

March 31, 1994.

Richard Fuchs, Koskoff, Koskoff & Bieder, Bridgeport, CT, for plaintiffs.

Jennifer C. Hickox, Bai, Pollock & Dunnigan, Bridgeport, CT, for defendants.

### RULING ON MOTION TO DISMISS

NEVAS, District Judge.

The plaintiffs Gladys and Ricardo Almonte ("plaintiffs") bring this negligence action individually and on behalf of their son, Denny Almonte, against the defendants New York Medical College (the "College"), and Dr. Douglas Ingram ("Ingram"). Plaintiffs allege that their son was sexually assaulted by Dr. Joseph DeMasi ("DeMasi"), a psychiatric resident at New York College, who received psychoanalytic training from Ingram, and disclosed to Ingram during this training that he was a pedophiliac.

As to the College, the complaint alleges two causes of action for common law negligence, an action for breach of contract, and a cause of action for failure to warn. As to Ingram, the complaint alleges a cause of action for negligence based on his duty to DeMasi's future patients.

■ Presently, Ingram moves to dismiss the claim against him pursuant to Rule 12(b)(6), Fed.R.Civ.P. on the grounds that it is barred by the Connecticut Statute of Limitations and it fails to assert a claim against Ingram for which relief can be granted. For the reasons that follow, this motion [doc. # 11] is DENIED.[1]

1. The court notes that the plaintiffs have also requested the court to certify this issue to the Connecticut Supreme Court pursuant to Conn. Gen.Stat. § 51–199(a). The court recognizes that as an issue of first impression, resolution in the state forum might be preferable. *See also Doe v. British Univ. American Club,* 788 F.Supp. 1286, 1290 n. 1 (D.Conn.1992) (stating that this issue is more appropriately resolved by Connecticut courts). However, the court finds that certification is not warranted in this instance especially in light of the fact that the matter has been fully briefed and argued by the parties before this court. *See Bethphage Lutheran Serv., Inc. v. Weicker,* 965 F.2d 1239, 1246 (2d Cir.1992) (certification procedure should be used sparingly); *Dorman v. Satti,* 862 F.2d 432, 436 (2d Cir.1988) (certification to state court is not appropriate where state court is in no better position than federal court to decide issue); *Kearney v. Philips Indus., Inc.,* 708 F.Supp. 479, 481 (D.Conn.1987) ("mere absence of a clear signal from sources of state law as to how a novel legal question should

## STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, the court is required to accept as true all factual allegations in the complaint and draw inferences from these allegations in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Easton v. Sundram*, 947 F.2d 1011, 1014–15 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Dismissal is warranted only if, under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his or her claims." *United States v. Yale New Haven Hosp.*, 727 F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer*, 416 U.S. at 232, 94 S.Ct. at 1684).

## FACTS

With this standard in mind, the facts are as follows. At the time that Dr. Joseph DeMasi was a psychiatric post-graduate student/resident at New York Medical College, he applied to and was accepted into the medical school's Division of Psychoanalytic Training. A resident's decision to enter this division is voluntary, and although training in psychoanalysis is not mandatory for a resident to become a psychiatrist, it is mandatory if the resident wishes to become a psychoanalyst. Thus, once a student enrolls in the Division of Psychoanalytic training, as DeMasi did, the student is required to undergo analysis, and Ingram was DeMasi's analyst. (*See also* doc. # 32.)

be decided is not in itself grounds to certify the question...").

2. Conn.Gen.Stat. § 52–584 provides in relevant part:
   No action to recover damages for injury to the person ... caused by negligence, ... or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or

During his training, DeMasi told Ingram that he was a pedophiliac. Ingram was also aware that DeMasi intended to enter child psychiatry as a profession. At no time did Ingram attempt to prevent Demasi from treating children or to prevent Demasi's promotion to a position of responsibility.

Prior to September of 1986, the College entered into a written agreement to affiliate with Danbury Hospital. As part of his training, Demasi did a psychiatric rotation at Danbury Hospital, but the College failed to apprise the hospital of Demasi's prior unsatisfactory clinical evaluations. In September of 1986, Denny, who was ten years old at the time, was referred to the Danbury Hospital Crisis Center for treatment for possible suicidal ideation. Denny was also considered to be borderline mentally retarded. During this treatment, Demasi sexually assaulted and threatened Denny on a number of occasions. As a result of said sexual assaults and threats, Denny suffered severe personal injuries.

## DISCUSSION

Ingram argues that this claim is barred by the Connecticut statute of limitations, and that under New York substantive law, the plaintiffs fail to state a claim upon which relief can be granted. The court disagrees.

### A. *Statute of Limitations*

The parties agree that a Connecticut statute of limitations governs this action. The parties disagree, however, as to which statute of limitations should apply. Ingram argues that the claim against him sounds in professional negligence such that Conn.Gen. Stat. § 52–584[2] applies, and under this statute the action against him is clearly untimely.

discovered, ... and except that no such action may be brought more than three years from the date of the act or omission complained of....

Conn.Gen.Stat. § 52–577, also referred to by the parties, states that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."

The plaintiffs contend, however, that the applicable statute of limitations is not § 52–584, but rather § 52–577d, which states:

> no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than seventeen years from the date such person attains the age of majority.

Although this action is seeking to recover damages for a personal injury to a minor caused by sexual assault, Ingram argues that the extended limitation was intended to apply only to the perpetrators of the sexual assault, not to individuals such as Ingram who are not the actual offenders. Thus, relying on the legislative history of the statute which refers to the intent to expand the right of action against "offenders," Ingram contends that because the action is not against Demasi, the perpetrator of the abuse, § 52–577d does not apply.

The court is now asked to revisit an issue previously presented, but not decided, in a prior case before this court. *See Doe v. British Univers. N. Am. Club*, 788 F.Supp. 1286, 1290 n. 1 (D.Conn.1992). In *Doe*, this court recognized the absence of controlling case law on this issue, and indicated that the matter was better resolved by the Connecticut courts. As there still is no Connecticut precedent to govern this analysis, the court must decide this issue as it believes the Connecticut Supreme Court would. Undertaking this analysis, the court concludes that § 52–577d is not limited to actions against the actual perpetrators of the sexual abuse, and applies to this case.

### 1. *Statutory Language and Legislative Intent*

■ The court's conclusion is driven in large part by the language of the statute. Quite simply, the statute does not expressly limit its application to offenders; rather, reference to the unambiguous language of the statute indicates that the statutory focus is on *actions* flowing from a particular type of harm, and not *parties*. In other words, in defining the scope of the statute, courts should look to whether the underlying harm was allegedly "caused by sexual abuse, sexual exploitation or sexual assault," § 52–577d, rather than whether the named defendants are potentially primarily or only secondarily liable for the alleged harm.

Such a harm-based (rather than party-based) approach is consistent with the legislative intent behind the statute. As the Connecticut Supreme Court has explained, "[a]lthough statutes of limitation generally operate to prevent the unexpected enforcement of stale claims ...; one object of § 52–577d is to afford a plaintiff sufficient time to recall and come to terms with traumatic childhood events before he or she must take action." *Roberts v. Caton*, 224 Conn. 483, 493, 619 A.2d 844 (1993) (citing to House and Senate debate concerning Public Act 91–240, at 34 H.R.Proc., Pt. 13, 1991 Sess. 4706–4707 and 34 S.Proc., Pt. 7, 1991 Sess. 2495). Indeed, the statute of limitations was extended from two to seventeen years after the victim reaches majority following "substantial testimony before the Committee that minor victims of sexual assault often do not understand or recognize the damage which they have sustained until a substantial number of years after they attain majority." *Roberts*, 224 Conn. at 493 n. 8, 619 A.2d 844 (quoting comment of Senator Anthony V. Avallone, 34 S.Proc., Pt. 7, 1991 Sess. 2495).

In recognizing that it may take years for a victim to come to terms with the sexual abuse, the Legislature implicitly understood that it may take as much time to identify those responsible for the abuse: It is only logical that the abuse and the abuser must be identified before the chain of responsibility can be discovered.[3] Thus, were § 52–577d

---

3. Ingram points to the fact that this is not a case of "delayed discovery" as the plaintiffs "were well aware of Dr. Ingram's care and treatment of Joseph DeMasi prior to bringing the earlier civil lawsuit" against DeMasi and Danbury Hospital which the plaintiffs settled. (Def.Brief, doc. # 30, at 13.) The court recognizes that the underlying policy of the extended statute of limitations is not directly served when an action is delayed even though the plaintiff is fully aware of the misconduct. Here, however, it is unclear whether the plaintiffs were fully aware of Ingram's potential liability as Ingram contends. More significantly, however, Connecticut does

limited to actions against perpetrators only, many if not most non-offender prospective defendants would, for all practical purposes, be rendered immune to suit. Such a result is both contrary to public policy and inconsistent with the Legislature's intent to broaden the remedies available to victims of sexual abuse through the extended limitations period.[4]

## 2. Application of Specific Over General Statutes

■ Furthermore, although there is no Connecticut case law directly addressing this issue, at least one court has applied § 52–577d to non-perpetrators. In the consolidated cases, *See v. Bridgeport Roman Catholic Diocesan Corp, et al.* and *Rosado v. Bridgeport Roman Catholic Diocesan Corp., et al.*, 1993 WL 382300 (Conn.Super.1993) (Freedman, J.), the defendants—the alleged priest/offender and the church—argued that the general statutes of limitations for personal injuries applied, rather than § 52–577d.

It is unclear whether the parties raised the question, at issue here, concerning the scope of § 52–577d and the Connecticut Superior Court did not discuss this issue. Instead, relying on the rule of statutory construction favoring application of specific over general statutes, the Superior Court held that the cases were governed by the more specific statute of limitations contained in § 52–577d, rather than the more general statutes of limitations in § 52–577 or § 52–584. *Accord Borawick v. Shay*, 1993 WL 127087, *2, *5 (D.Conn. Jan. 27, 1993) (in action against perpetrators, court held that the more recent and specific limitation in § 52–577d applied over that in § 52–584). This rule of statutory construction favors application of § 52–577d in this case as well.[5]

The Superior Court's ruling in *See* and *Rosado* is further significant insofar as the court's analysis does not distinguish between the perpetrator and non-perpetrator defendants. Other jurisdictions with similar statutes of limitations have also applied such statutes uniformly without distinguishing be-

not employ a "discovery rule," but instead applies an extended statute of limitations which makes no mention of when the action was "discovered." Thus, when the plaintiffs became aware of Ingram's potential liability seems inapposite to the statute of limitations' analysis. Indeed, the Legislature likely avoided a discovery-based rule in an effort to minimize these types of inquiries.

4. The court notes that of twenty-two state statutes of limitations for actions based on sexual abuse of a child reviewed by the court, Connecticut's is one of the most liberal. *See* Alaska Stat. § 9.10.140 (action within 3 years of reasonable discovery); Ark.Code.Ann. § 16–56–130 (action within 3 years of discovery); Cal.Civ.Code Proc. § 340.1 (action within 3 years of majority or discovery); Conn.Gen.Stat. § 52–577d (action within 17 years of majority); Ga.Code Ann. § 9–3–33.1 (action within 5 years of majority); 735 ILCS 5/13–202.2 (action within 2 years of discovery) (as amended 1993); 1993 Iowa Acts § 614.8A (action within 4 years from discovery); Kan.Stat.Ann. § 60–523 (action within 3 years of discovery or majority); La.Rev.Stat.Ann. § 9:2800.9 (action within 10 years of majority); Minn.Stat. § 541.073 (action within six years of discovery); Mo. rev. Stat. § 537.046 (action within 5 years of majority or 3 years of discovery); Mont.Code Ann. § 27–2–216 (action within 3 years of act or discovery); Nev.Rev.Stat. § 11.-215 (action within 10 years of discovery or ma-

jority); N.J.Rev.Stat. § 2A:61B–1 (action within 2 years of reasonable discovery); N.M.Stat.Ann. § 37–1–30 (action within 3 years of discovery or six years of majority); Okla.Stat. tit. 12, § 95 (action within 2 years of act or date of discovery, but no later than 20 years after majority); R.I Gen.Laws § 9–1–51 (action within 7 years of act or discovery); S.D.Codified Laws Ann. § 26–10–25 (action within 3 years of act or discovery); Utah Code Ann. § 78–12–25.1 (action within 4 years of majority or discovery); Vt.Stat.Ann. tit. 12, § 522 (action within 6 years of injury of discovery); Va.Code Ann. § 8.01–249 (action within 10 years of last act or removal of disability of infancy or incompetency); Wash.Rev.Code § 4.16.340 (action within 3 years of injury or discovery, but period tolled until reach 18).

5. This concept of general versus specific statutes of limitations also applies to another of Ingram's arguments: As further evidence that the Legislature did not intend § 52–577d to apply over § 52–584, Ingram points to the fact that § 52–577d makes no mention of § 52–584 although it specifically states that the statute applies "[n]otwithstanding the provisions of section 52–577." Conn.Gen.Stat. § 52–577d. However, § 52–577 is the most general statute of limitations applicable to tort actions and provides the outside limitation of three years for all such actions, and this limitation is incorporated in § 52–584. It is thus logical that § 52–577d would only refer to the more general and maximum limitations period contained in § 52–577, and not to § 52–584.

tween defendants. *See, e.g., Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899 (Tenn. Ct.App.1993) (applying uniform analysis of Tennessee extended statute of limitations for sexual abuse with respect to offender and non-offender defendants); *K.E. v. Hoffman,* 452 N.W.2d 509 (Minn.Ct.App.1990) (making no distinction between offender and non-offender defendants with respect to interpretation of Minnesota's extended statute of limitations).

In sum, although the defendants in this action are not the perpetrators of the alleged sexual abuse, this action remains one to redress harm allegedly caused by sexual abuse. Therefore, following the suggested harm-based approach, the court finds that the extended statute of limitations in § 52–577d applies to this action, and the complaint is timely.

B. *Failure to State a Claim for which Relief can be Granted*

Ingram also argues that plaintiffs fail to state a viable claim for negligence because under New York law (1) he had no duty to the child, (2) any information he had was privileged and (3) because the child's claim must fail, the parents' derivative claims must fail as well.

Plaintiffs contend that (1) Connecticut, not New York, law applies and (2) Ingram had a special relationship with Demasi and therefore had a duty to warn of or control Demasi's foreseeable conduct. The court agrees.

1. *Conflict of Law*

"A federal court sitting in diversity is bound to apply the law of the forum state. This includes conflict of law principles." *Economu v. Borg–Warner Corp.,* 652 F.Supp. 1242, 1246 (D.Conn.1987) (citations omitted), *aff'd,* 829 F.2d 311 (2d Cir.1987). Under Connecticut choice of law principles, the governing law is that of the " 'state which ... has the most significant relationship to the occurrence and the parties....' " *O'Connor v. O'Connor,* 201 Conn. 632, 650

[519 A.2d 13] (1986) (quoting Restatement (Second) Conflicts of Laws § 145). To determine the forum with the most significant relationship in the context of a tort case, the court considers " '(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the ... residence ... and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.' " *Id.* (quoting Restatement (Second) Conflicts of Law § 145(2)).

■ With these considerations in mind, the court finds that Connecticut law applies. Connecticut was both the place of injury as well as the place where at least some of the injury-causing conduct occurred.[6] Furthermore, all of the plaintiffs reside in Connecticut and Connecticut is the forum where the relationship between the parties, established through DeMasi at Danbury Hospital, was centered. Moreover, application of Connecticut law is consistent with the doctrine of lex loci delicti,[7] to which Connecticut still adheres, albeit not without exception. *O'Connor,* 201 Conn. at 15, 21–22, 519 A.2d 13 (doctrine applies unless result is arbitrary or irrational).

Ingram argues that application of Connecticut law would create an arbitrary result as it would mean that Ingram, who practices in New York and has no ties to Connecticut, would be governed by foreign and potentially conflicting law. Ingram also argues that New York has an important interest in applying its law in this case because under New York law, plaintiffs' claims would not be viable as any disclosure by Demasi was privileged and therefore Ingram was barred from disclosing the information. Both arguments are, however, unavailing.

First, by affiliating with Danbury Hospital, the College and Ingram were at least put on notice that they might be sued in Connecticut such that application of Connecticut law is not as anomalous as Ingram contends. In addition, the court's review of relevant New

---

**6.** The defendants' acts or omissions occurred in New York although the conduct directly causing the injury occurred in Connecticut.

**7.** This doctrine presumes that the parties' rights and obligations vest at the place of injury. *O'Connor,* 201 Conn. at 16, 519 A.2d 13.

York case law indicates that the New York privilege is not as absolute as Ingram contends; indeed *People v. Sâaratu,* 143 Misc.2d 1075, 541 N.Y.S.2d 889 (N.Y.Sup.Ct.1989), relied on by Ingram, has been disagreed with by subsequent New York cases. *See, e.g., McBarnette v. Feldman,* 153 Misc.2d 627, 582 N.Y.S.2d 900 (N.Y.Sup.Ct.1992); *People v. Figueroa,* 173 A.D.2d 156, 568 N.Y.S.2d 957 (N.Y.Sup.Ct.1991), *app. denied,* 78 N.Y.2d 1075, 577 N.Y.S.2d 239, 583 N.E.2d 951 (1991); *People v. Gomez,* 147 Misc.2d 704, 556 N.Y.S.2d 961 (Sup.Ct.1990). Therefore, New York's interest is this case does not outweigh Connecticut's, and Connecticut law shall apply.

### 2. *Existence of Duty*

■ Finally, to sustain their action for negligence, the court must find that Ingram had a duty to protect the plaintiffs. Under Connecticut law, a court may find a duty to use care where it is foreseeable that harm may result if such care is not exercised. *British Univers. N. Am. Club,* 788 F.Supp. at 1292. The parties agree that to determine whether Ingram had any duty to control DeMasi's conduct, the court should look to the Restatement (Second) Torts § 315 which provides:

> There is no duty to control the conduct of a third person as to prevent him from causing physical harm to another unless: (a) a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relationship exists between the actor and the other which gives to the other the right to protection.

■ The majority of courts addressing the relationship between a psychiatrist and a voluntary patient have found that "the psychiatrist has a duty to control the patient only when he knows or has reason to know that the patient poses a specific threat to a particular person or when the patient is involuntarily committed." *Fraser v. United States,* Civ. No. 5:87CV00125 (WWE), slip op. at 7, 1993 WL 667632 (D.Conn. July 15, 1993). *Accord Tarasoff v. Regents of the Univers. of Cal.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 20, 551

P.2d 334, 340 (1976) (therapist may incur an obligation to protect a patient's intended victim). *See also Brady v. Hopper,* 570 F.Supp. 1333, 1338 (D.Colo.1983) ("Unless a patient makes specific threats, the possibility that he may inflict injury on another is vague, speculative and a matter of conjecture."), *aff'd,* 751 F.2d 329 (10th Cir.1984). *See generally Currie v. United States,* 644 F.Supp. 1074, 1080–84 (M.D.N.C.1986) (discussing distinction between duty to control and to warn and advocating "psychotherapist judgment rule" as standard of review); *aff'd,* 836 F.2d 209 (4th Cir.1987).

In *Fraser,* for example, the court held that the Veteran's Hospital did not have a special relationship with a voluntary psychiatric outpatient that would support imposition of a duty to control the patient owed to the general public. *Fraser,* slip op. at 10. *But see Tarasoff,* 551 P.2d at 343 (relationship between therapist and patient satisfies the "special relationship" requirement).

The present case is, however, distinguishable from *Fraser* on a number of grounds. First, the relationship between Ingram and Demasi was not solely that between a psychiatrist and a voluntary patient. Rather, Ingram was DeMasi's instructor as well as his analyst, and thus had official authority or control over DeMasi that does not exist in the usual analyst-voluntary patient relationship.

This two-tiered, and arguably quasi-custodial, relationship also leads to another distinguishing factor: because Ingram was Demasi's medical school instructor as well as his psychoanalyst, Ingram had reason to know that Demasi posed a specific threat to a specific group of persons, namely future minor patients, with whom DeMasi would necessarily interact as part of his training.

Furthermore, unlike the other cases rejecting a duty to control owed to the public by a psychiatrist/analyst, Ingram, in his capacity as DeMasi's medical school instructor, had feasible and not unreasonably burdensome mechanisms for control available to him. *Cf. Kaminski v. Fairfield,* 216 Conn. 29, 35, 578 A.2d 1048 (1990) (duty to control generally found "in the context of profession-

al custodians with special competence to control the behavior of those in their charge."); *Tarasoff*, 551 P.2d at 342 (among other factors, court should consider burden to the defendant and consequences to the community of imposing the duty). For example, Ingram could have taken steps to redirect De-Masi's professional development without even compromising the confidentiality of De-Masi's disclosures to him.

Moreover, regardless of whether plaintiffs have alleged a sufficient basis upon which to find that Ingram owed a duty to control Demasi's conduct, the court finds that the plaintiffs have at least alleged adequate grounds upon which to find that Ingram had a duty to warn. *See Fraser*, slip. op. at 10; *see also Kaminski*, 216 Conn. at 37, 578 A.2d 1048. As the California court in *Tarasoff* explained, "[w]hen a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger," and the discharge of this duty may include the duty to "warn the intended victim or others likely to apprise the victim of the danger...." *Tarasoff*, 551 P.2d at 340. *Accord White v. United States*, 780 F.2d 97, 101 (D.C.Cir.1986) (recognizing duty to warn and noting that the *Tarasoff* rule is followed in a number of jurisdictions); *Jablonski v. United States*, 712 F.2d 391, 398 (9th Cir.1983) (following *Tarasoff* even though no specific threats made to victim).

Significantly, the Connecticut Supreme Court in *Kaminski* did not reject *Tarasoff*, but merely distinguished the case on its facts. Indeed, in distinguishing *Tarasoff*, the Connecticut Supreme Court appears to have accepted "the rule that a psychiatrist who knows or should know that a patient poses a threat to a particular victim or *class of victims* has a duty to warn such victims of the danger...." *Fraser*, slip op. at 10 (citing *Kaminski*, 216 Conn. at 37, 578 A.2d 1048) (emphasis added).

Here, the plaintiffs allege that although Ingram knew that DeMasi was a pedophiliac and that he intended to pursue and practice child psychiatry, neither Ingram nor the College took any steps on the basis of this knowledge. Because the court finds that a self-confessed pedophiliac who intends to practice child psychiatry presents a foreseeable threat of harm to future minor patients, and assuming that Ingram and the College could have, but did not, take steps to warn Danbury hospital or otherwise protect future patients such as Denny, the court concludes that the plaintiffs' complaint states a claim against Ingram and the College for failure to exercise reasonable care to protect Denny against such foreseeable harm. *Compare British Univers. N. Am. Club*, 788 F.Supp. at 1292 (finding no duty to warn about counselor's sexual orientation because sexual molestation is not a foreseeable risk of homosexuality).

### CONCLUSION

Based on the foregoing, Ingram's motion to dismiss [doc. # 11] is DENIED.

SO ORDERED.